# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

THOMAS R. ROGERS., *et al.*,          )
                                      )
                    *Plaintiffs*,     )          Civil Action No. 18-1544
                                      )
          v.                          )          Judge Brian R. Martinotti
                                      )          Magistrate Judge Douglas E. Arpert
GURBIR GREWAL, *et al.*,              )
                                      )
                    *Defendants*.     )          Motion Day: May 7, 2018


## PLAINTIFFS' BRIEF IN OPPOSITION
## TO DEFENDANTS' MOTION TO DISMISS

David H. Thompson*                    Daniel L. Schmutter
Peter A. Patterson*                   HARTMAN & WINNICKI, P.C.
John D. Ohlendorf*                    74 Passaic Street
COOPER & KIRK, PLLC                   Ridgewood, New Jersey 07450
1523 New Hampshire Avenue, N.W.       (201) 967-8040
Washington, D.C. 20036                (201) 967-0590 (fax)
(202) 220-9600                        dschmutter@hartmanwinnicki.com
(202) 220-9601 (fax)
dthompson@cooperkirk.com

    *Appearing *pro hac vice*


*Attorneys for Plaintiffs*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ..................................................................... ii

INTRODUCTION ................................................................................1

STATEMENT ....................................................................................3

I.  New Jersey's "justifiable need" requirement ...................................3

II. Defendants' refusal to issue Plaintiffs handgun carry licenses ......................5

ARGUMENT ....................................................................................6

I.  The conduct restricted by New Jersey's "justifiable need" requirement lies at the core of the Second Amendment. ....................................7

    a.  Text, history, precedent, and purpose all confirm that the right to keep and bear arms extends outside the home. ...............................7

    b.  *Drake* erred in concluding that New Jersey's "justifiable need" requirement is longstanding and "presumptively lawful."................18

    c.  The right to carry arms outside the home in self-defense is at the core of the Second Amendment. ....................................23

II. Under *Heller*, Defendants' requirement that law-abiding citizens demonstrate a special need for self-defense to exercise their Second Amendment rights is categorically unconstitutional. ....................................26

III. *Drake* was wrong to uphold Defendants' "justifiable need" restriction under intermediate scrutiny. ....................................29

    a.  Strict scrutiny should apply.................................................29

    b.  Defendants' "justifiable need" restriction fails even intermediate scrutiny, properly applied.................................................29

IV. Defendants Oxley and Conforti are not entitled to judicial immunity..........37

CONCLUSION ....................................................................................39

i

# TABLE OF AUTHORITIES

**Cases**                                                                                                    **Page**

*Atwater v. City of Lago Vista*, 532 U.S. 318 (2001)................................................12

*Aymette v. State*, 21 Tenn. 154 (1840) ...................................................................19

*Bliss v. Commonwealth*, 12 Ky. (2 Litt.) 90 (1822)....................................15, 19, 20

*Brandon E. ex rel. Listenbee v. Reynolds*, 201 F.3d 194 (3rd Cir. 2000)...............38

*Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751 (2014) ...............................28

*Caetano v. Massachusetts*, 136 S. Ct. 1027 (2016) ...................................................9

*City of Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425 (2002) ........................30

*City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41 (1986) ..............................30

*District of Columbia v. Heller*, 554 U.S. 570 (2008) ......................................*passim*

*Drake v. Filko*, 724 F.3d 426 (3d Cir. 2013) ...................................................*passim*

*Dred Scott v. Sandford*, 60 U.S. (19 How.) 393 (1857) .........................................17

*Employment Div., Dep't of Human Res. of Oregon v. Smith*,
    494 U.S. 872 (1990)..............................................................................................28

*First Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765 (1978)...................................28

*Forrester v. White*, 484 U.S. 219 (1988) .................................................................39

*Grace v. District of Columbia*,
    187 F. Supp. 3d 124 (D.D.C. 2016)...........................................29, 30, 31, 32, 37

*Heller v. District of Columbia (Heller III)*, 801 F.3d 264 (D.C. Cir. 2015)......30, 31

*In re Preis*, 573 A.2d 148 (N.J. 1990) .............................................................*passim*

*Kachalsky v. County of Westchester*, 701 F.3d 81 (2d Cir. 2012)...........................20

*Mance v. Holder*, 74 F. Supp. 3d 795 (N.D. Tex. 2015) ........................................22

*McCullen v. Coakley*, 134 S. Ct. 2518 (2014) ...................................................36, 37

*McDonald v. City of Chicago*, 561 U.S. 742 (2010) ......................11, 18, 26, 27, 29

*Moore v. Madigan*, 702 F.3d 933 (7th Cir. 2012) ...........................................*passim*

*New York Times Co. v. United States*, 403 U.S. 713 (1971) ...................................28

*Nunn v. State*, 1 Ga. 243 (1846)........................................................................14, 19

*Parker v. District of Columbia*, 478 F.3d 370 (D.C. Cir. 2007)..............................12

*Peruta v. County of San Diego*, 742 F.3d 1144 (9th Cir. 2014) ...................14, 20

*Peterson v. Martinez*, 707 F.3d 1197 (10th Cir. 2013) ......................................24, 25

*Pulliam v. Allen*, 466 U.S. 522 (1984) ...................................................................37

*Rex v. Knight*, 90 Eng. Rep. 330 (K.B. 1686) .................................................12, 15

*San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1 (1973) ...........................29

*Santiago v. Warminster Twp.*, 629 F.3d 121 (3d Cir. 2010)................................6, 7

*Shelby Cty. v. Holder*, 570 U.S. 529 (2013) ........................................................34

*Siccardi v. State*, 59 N.J. 545 (1971) ...................................................................38

*Simpson v. State*, 13 Tenn. 356 (1833) ..................................................................16

*Sir John Knight's Case*, 87 Eng. Rep. 75 (K.B. 1686) ..........................................15

*State v. Chandler*, 5 La. Ann. 489 (1850) ..............................................................19

*State v. Huntly*, 25 N.C. 418 (1843)........................................................................16

*State v. Reid*, 1 Ala. 612 (1840) ..............................................................14, 15, 20

*State v. Valentine*, 124 N.J. Super. 425 (App. Div. 1973).......................................31

*Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622 (1994) ..........................................34

*United States v. Marzzarella*, 614 F.3d 85 (3d Cir. 2010)......................................8

*United States v. Virginia*, 518 U.S. 515 (1996) .....................................................32

*Vujosevic v. Rafferty*, 844 F.2d 1023 (3d Cir. 1988) .................................................7

*Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292 (2016).............................35

*Wrenn v. District of Columbia*, 864 F.3d 650 (D.C. Cir. 2017) ......................*passim*

*Zuber v. Boscov's*, 871 F.3d 255 (3d Cir. 2017).......................................................6

## **Constitutional Provisions, Statutes, and Legislative and Regulatory Materials**

U.S. CONST. amend. II ..........................................................................................1, 8

42 U.S.C. § 1983...............................................................................................37, 38

N.J.S.A.

    2C:39-5(b)........................................................................................................3

    2C:58-3(c) ........................................................................................................4

    2C:58-4 .............................................................................................................3

    2C:58-4(c) ................................................................................................1, 3, 4

2C:58-4(d) ............................................................................................3

2C:58-4(e) .........................................................................................3, 4

N.J.A.C.

13:54-2.4(b) ......................................................................................4

13:54-2.4(d)(1) ................................................................1, 4, 5, 27

Act of Feb. 10, 1832, sec. 1, Del. Laws 180 (1832) .........................16, 17

An Act To Punish Certain Offences Therein Named, and for Other Purposes,
ch. 23, § 1, 1865 Miss. Laws 165 .......................................................17

CONG. GLOBE, 39th Cong., 1st Sess. 1182 (1866) (statement of Sen. Pomeroy)....18

## <u>Other</u>

John Adams, *First Day's Speech in Defence of the British Soldiers Accused of
Murdering Attucks, Gray and Others, in the Boston Riot of 1770*, in 6
MASTERPIECES OF ELOQUENCE (Hazeltine et al. eds., 1905) .............................14

4 WILLIAM BLACKSTONE, COMMENTARIES .......................................................12, 15

5 WILLIAM BLACKSTONE, COMMENTARIES (St. George Tucker ed., 1803)............13

*Legality of the London Military Foot-Association* (1780), *reprinted in* WILLIAM
BLIZZARD, DESULTORY REFLECTIONS ON POLICE (1785) ............................12, 13

BUREAU OF JUSTICE STATISTICS, CRIMINAL VICTIMIZATION IN THE UNITED
STATES, 2008 STATISTICAL TABLES (2010), http://goo.gl/6NAuIB ..................11

Philip J. Cook et al., *Gun Control After* Heller, 56 UCLA L. REV. 1041 (2009)....33

Robert J. Cottrol & Raymond T. Diamond, *The Second Amendment: Toward an
Afro-Americanist Reconsideration*, 80 GEO. L.J. 309 (1991).............................17

WILLIAM M. DARLINGTON, CHRISTOPHER GIST'S JOURNALS (1893) .......................14

1 WALTER L. FLEMING, DOCUMENTARY HISTORY OF RECONSTRUCTION (1906).....17

Robert Hahn et al., *Firearms Laws and the Reduction of Violence: A Systematic
Review*, 28 AM. J. PREVENTATIVE MED. (2005), http://goo.gl/zOpJFL........33, 34

Stephen P. Halbrook, *What the Framers Intended: A Linguistic Analysis of the
Right To "Bear Arms,"* 49 LAW & CONTEMP. PROBS. 151 (1986)....................35

1 WILLIAM HAWKINS, A TREATISE OF THE PLEAS OF THE CROWN (1716) .........12, 15

CHARLES HUMPHREYS, A COMPENDIUM OF THE COMMON LAW IN FORCE IN
KENTUCKY (1822) .............................................................................16

1 THE WORKS OF THOMAS JEFFERSON (letter of Aug. 19, 1785) (H. A. Washington ed., 1884) ..........................................................................................14

NICHOLAS J. JOHNSON & DAVID B. KOPEL ET AL., FIREARMS LAW & THE SECOND AMENDMENT (2012) ..........................................................................................13

2 JAMES KENT, COMMENTARIES ON AMERICAN LAW (O. Holmes ed., 12th ed. 1873) ..........................................................................................20

Michael J. Klarman, *Rethinking the Civil Rights & Civil Liberties Revolutions*, 82 VA. L. REV. 1 (1996) ..........................................................................................22

Gary Kleck & Marc Gertz, *Armed Resistance to Crime: The Prevalence and Nature of Self-Defense With a Gun*, 86 J. CRIM. L. & CRIMINOLOGY 150 (1995) ..........................................................................................36

Gary Kleck & Marc Gertz, *Carrying Guns for Protection: Results from the National Self-Defense Survey*, 35 J. RESEARCH IN CRIME & DELINQUENCY 193 (1998) ..........................................................................................36

WILLIAM LAMBARD, EIRENARCHA (1588) ...........................................................15

*Firearms*, Monticello, https://goo.gl/W6FSpM ....................................................14

David B. Mustard, *Comment*, *in* EVALUATING GUN POLICY (Jens Ludwig & Philip J. Cook eds., 2003) ..........................................................................................32, 33

NATIONAL RESEARCH COUNCIL, FIREARMS AND VIOLENCE: A CRITICAL REVIEW (Charles F. Wellford, John V. Pepper, & Carol V. Petrie eds., 2005), http://goo.gl/WO1ZNZ ..........................................................................................33, 36

*Gun Laws*, NRA-ILA, https://goo.gl/Nggx50 .......................................................32

Steve Sweeney, President, New Jersey Senate, Remarks, N.J. Governor and Attorney General Announce Intention to Tighten Restrictions on Handgun-Carry Permits (Jan. 26, 2018), *available at* https://goo.gl/U4iTET ..................31

HARLOW GILES UNGER, LION OF LIBERTY (2010) .................................................14

3 JAMES WILSON, THE WORKS OF THE HONOURABLE JAMES WILSON (1804) .........16

**INTRODUCTION**

At the core of the Second Amendment lies "the individual right to possess and carry weapons in case of confrontation." *District of Columbia v. Heller*, 554 U.S. 570, 592 (2008). When the people elevated that right into the Nation's fundamental charter, they did not mean to leave the freedom to exercise it at the mercy of the very government officials whose hands they sought to bind. No, "[t]he very enumeration of the right takes out of the hands of government . . . the power to decide on a case-by-case basis whether the right is *really worth* insisting upon." *Id.* at 634.

Defendants—state and local officials responsible for administering and enforcing New Jersey's regulations governing carrying firearms outside the home—have imposed severe limits on "the right of the people to . . . bear Arms," U.S. CONST. amend. II, that flout these basic constitutional principles at every turn. New Jersey has seized the very power forbidden it by the Second Amendment: the power to decide, on a case-by-case basis, whether an applicant for a license to "carry weapons in case of confrontation," *Heller*, 554 U.S. at 592, has, in the estimation of its local licensing authorities, shown a sufficiently "justifiable need" to exercise that right, N.J.S.A. 2C:58-4(c). Worse still, the State has determined that a general desire to carry a weapon for self-defense is not a sufficiently justifiable need—demanding, instead, proof that a law-abiding citizen wishing to exercise the right has an "urgent necessity for self-protection," N.J.A.C. 13:54-2.4(d)(1), more acute than a

1

"generalized fear[ ] for personal safety," *In re Preis*, 573 A.2d 148, 152 (N.J. 1990). Defendants have thus struck a balance *directly contrary* to the Constitution's reservation to the people themselves of the right to determine whether to carry firearms for the "core lawful purpose of self-defense." *Heller*, 554 U.S. at 630.

To be sure, as New Jersey points out, the Third Circuit—in precedent we concede is binding on this Court at this stage in the litigation—has upheld the State's "justifiable need" limit. *Drake v. Filko*, 724 F.3d 426 (3d Cir. 2013). But *Drake* is deeply flawed, and it should be overturned. *Drake* disregards the extensive textual and historical evidence demonstrating that the right to carry firearms for self-protection outside the home is at the very core of the Second Amendment. It adopts mere "intermediate" constitutional scrutiny, effectively relegating the right to bear arms to second-class status. And even if the choice of intermediate scrutiny were defensible, *Drake's* application of it—deferring to the State's judgment that its restriction advances public safety, even though New Jersey has wholly failed to support that proposition with any meaningful evidence—is not.

In sum, New Jersey's "justifiable need" restriction is unconstitutional, but Plaintiffs concede that this Court is presently bound by circuit precedent to uphold it.

Finally, Defendants are wrong to contend that Defendants Oxley and Conforti—two Superior Court judges tasked by state law with administering New

Jersey's permitting regime—are immune from suit. As Defendants concede, judicial immunity applies only where a defendant is haled into court for acting in his judicial capacity. And New Jersey law makes clear beyond doubt that in granting or denying Handgun Carry Permit applications, Superior Court Judges are undertaking "essentially an executive function" that is "clearly non-judicial in nature." *In re Pries*, 573 A.2d at 151. No judicial immunity shields Defendants Oxley and Conforti from suit based on these non-judicial acts.

## STATEMENT

### I.   New Jersey's "justifiable need" requirement

Under New Jersey law, an ordinary member of the general public who wishes to carry a handgun outside the home must first obtain a permit to do so (a "Handgun Carry Permit"). N.J.S.A. 2C:39-5(b), 2C:58-4. A person seeking such a permit must first apply to the Chief Police Officer of the municipality where he resides. *Id.* § 2C:58-4(c).[1] If the officer concludes, after investigation, that the applicant meets all statutory requirements and approves the application, it is then presented to the Superior Court of the county where he resides. *Id.* § 2C:58-4(d). If the application is denied, the applicant may also appeal that denial to the Superior Court. *Id.* § 2C:58-4(e). In either case, if the Superior Court independently determines that the applicant

---

[1] An individual who resides out of state, or in a municipality without a Chief Police Officer, must instead apply to the Superintendent of State Police. *Id.*

has satisfied all statutory requirements, it may then issue a Handgun Carry Permit. *Id.* In reviewing applications and issuing permits, the Superior Court acts as an "issuing authority" and performs "essentially an executive function" that is "clearly non-judicial in nature." *In re Preis*, 573 A.2d at 151, 154.

New Jersey imposes some objective restrictions on eligibility for a Handgun Carry License. For example, an applicant must not have been convicted of any crime or offense involving an act of domestic violence; must not be addicted to controlled substances, mentally infirm, or an alcoholic; must not be subject to certain restraining orders; and must not be listed on the FBI's Terrorist Watchlist. N.J.S.A. 2C:58-4(c), 2C:58-3(c). An applicant must also pass criminal and mental health background checks, *id.* § 2C:58-4(c), and must have satisfied extensive firearms safety training requirements, N.J.A.C. 13:54-2.4(b).

In addition to these eligibility requirements, New Jersey also imposes a more subjective restriction on the availability of Handgun Carry Permits: an applicant must demonstrate "that he has a justifiable need to carry a handgun." N.J.S.A. 2C:58-4(c). For an ordinary "private citizen," this requirement is satisfied only if the applicant can "specify in detail the urgent necessity for self-protection, as evidenced by serious threats, specific threats, or previous attacks, which demonstrate a special danger to the applicant's life that cannot be avoided by reasonable means other than

4

by issuance of a permit to carry a handgun." N.J.A.C. 13:54-2.4(d)(1).[2] "Generalized fears for personal safety are inadequate, and a need to protect property alone does not suffice." *In re Preis*, 573 A.2d 148, 152 (N.J. 1990).

Accordingly, typical law-abiding citizens of New Jersey—the vast majority of responsible citizens who cannot "demonstrate a special danger to [their] life," as "evidenced by serious threats, specific threats, or previous attacks," N.J.A.C. 13:54-2.4(d)(1)—effectively remain subject to a ban on carrying handguns outside the home for self-defense.

## II. Defendants' refusal to issue Plaintiffs handgun carry licenses

On January 11, 2017, Plaintiff Rogers filed an application for a Handgun Carry Permit with the Chief of Police for Wall Township, the town where he resides. Complaint for Declaratory & Injunctive Relief ¶ 30 (Feb. 5, 2018), Doc. 1 ("Compl."). Plaintiff Rogers does not face any special danger to his life, though he was robbed at gunpoint several years ago while working as the manager of a restaurant, and he currently runs a large ATM business that causes him to frequently

---

[2] "Serious threats" is a very recent addition to the standard, intended by Governor Christie to slightly tweak the rule in the absence of legislative support for genuine and significant reform. With the new administration, the Legislature is rapidly moving forward to eliminate this mild change in language. Both formulations are unconstitutional in exactly the same way.

work in high-crime areas. *Id.* ¶ 29. Accordingly, he desires to carry a handgun with him for purposes of self-defense. *Id.*

The Chief of Police, Defendant Kenneth Brown, Jr., did not dispute that Mr. Rogers met all of the eligibility and training requirements imposed by New Jersey Law, but he nonetheless denied his application because he "fail[ed] to establish Justifiable Need." *Id.* at Ex. 1. Plaintiff Rogers appealed Defendant Brown's denial of his application to Superior Court, and on January 2, 2018, a Superior Court judge, Defendant Joseph W. Oxley, also denied Rogers's application on the basis of his failure to establish justifiable need. *Id.* at Ex. 2.[3]

## ARGUMENT

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Zuber v. Boscov's*, 871 F.3d 255, 258 (3d Cir. 2017). "To determine the sufficiency of a complaint . . . a court must take three steps: First, the court must tak[e] note of the elements a plaintiff must plead to state a claim. Second, the court should identify allegations that, because they are no more than conclusions, are not entitled to the

---

[3] Defendants have also refused, on the basis of the "justifiable need" requirement, to grant at least one member of associational Plaintiff Association of New Jersey Rifle & Pistol Clubs ("ANJRPC") a license that would allow them to carry a firearm outside the home for self-defense. *Id.* ¶ 36. For instance, Defendant Conforti, a Superior Court judge in Sussex County, denied ANJRPC member Kenneth Warren's application on January 31, 2018, for failure to show justifiable need. *Id.* ¶ 35.

assumption of truth. Finally, where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief." *Santiago v. Warminster Twp.*, 629 F.3d 121, 130 (3d Cir. 2010) (second alteration in original) (citations and quotation marks omitted).

As Defendants point out, in *Drake*, the Third Circuit held that New Jersey's "justifiable need" restriction on the issuance of Handgun Carry Permits is consistent with the Second Amendment. Because this Court "does not have the discretion to disregard controlling precedent" from the Third Circuit, *Vujosevic v. Rafferty*, 844 F.2d 1023, 1030 n.4 (3d Cir. 1988), Plaintiffs do not dispute that it must follow the controlling decision in *Drake*, at this point in the proceedings. But *Drake*'s ruling is deeply flawed, and it should be overruled at the first opportunity by a court with authority to do so.

## I. The conduct restricted by New Jersey's "justifiable need" requirement lies at the core of the Second Amendment.

### a. Text, history, precedent, and purpose all confirm that the right to keep and bear arms extends outside the home.

In *District of Columbia v. Heller*, the Supreme Court held that the Second Amendment "guarantee[s] the individual right to possess and carry weapons in case of confrontation." 554 U.S. 570, 592 (2008). And although that landmark ruling did not purport to "clarify the entire field" of Second Amendment jurisprudence, *id.* at 635, *Heller* did set forth clear guidance about *the methodology* for deciding future

7

disputes over the right to keep and bear arms. Because "[c]onstitutional rights are enshrined with the scope they were understood to have when the people adopted them," *id.* at 634–35, deciding whether a government restriction challenged on Second Amendment grounds can be squared with that provision involves a close inquiry into the Amendment's "text in light of its meaning at the time of ratification," *United States v. Marzzarella*, 614 F.3d 85, 90 (3d Cir. 2010). Here, text, precedent, purpose, and history uniformly show that the carrying of firearms outside the home for self-defense is squarely protected by the Second Amendment right.

1.     The text of the Second Amendment leaves no doubt that it applies outside the home. The substance of the Second Amendment right reposes in the twin verbs of the operative clause: "the right of the people to keep *and bear* Arms, shall not be infringed." U.S. CONST. amend. II (emphasis added). Because "[t]o speak of 'bearing' arms within one's home would at all times have been an awkward usage," the Constitution's explicit inclusion of the "right to bear arms thus implies a right to carry a loaded gun outside the home." *Moore v. Madigan*, 702 F.3d 933, 936 (7th Cir. 2012). Indeed, interpreting the Second Amendment as confined to the home would read the second of these guarantees—the right to bear arms—out of the Constitution's text altogether, for the right to keep arms standing alone would be sufficient to protect the right to have arms in the home.

8

2.      Confining the right to keep and bear arms to the home would also be at war with precedent. The Supreme Court's decision in "*Heller* repeatedly invokes a broader Second Amendment right than the right to have a gun in one's home." *Id.* at 935–36. For instance, *Heller* squarely holds that the Second Amendment "guarantee[s] the individual right to possess *and carry* weapons in case of confrontation," 554 U.S. at 592 (emphasis added), and it defines the key constitutional phrase "bear arms" as to " 'wear, bear, or carry . . . upon the person or in the clothing or in a pocket, for the purpose . . . of being armed and ready for offensive or defensive action in a case of conflict with another person,' " *id.* at 584 (alteration in original) (quoting *Muscarello v. United States*, 524 U.S. 125, 143 (1998) (Ginsburg, J., dissenting)). *Heller*'s indication that "laws forbidding the carrying of firearms in sensitive places such as schools and government buildings" are "presumptively lawful" also implicitly recognizes a general right to bear arms in public; otherwise there would be no need to identify exceptions. *Id.* at 626, 627 n.26. Moreover, *Heller* extensively cites and significantly relies upon *Nunn v. State*, a nineteenth-century Georgia case that "struck down a ban on carrying pistols openly" under the Second Amendment. *Id.* at 612; *see also Caetano v. Massachusetts*, 136 S. Ct. 1027 (2016) (vacating state court ruling that the Second Amendment does not protect the right to carry a stun gun in public).

The Third Circuit in *Drake* "decline[d] to definitively declare that the individual right to bear arms for the purpose of self-defense extends beyond the home," choosing instead to assume for the sake of analysis that the Amendment has "some application beyond the home." 724 F.3d at 431. That assumption is consistent with the persuasive authority from other federal courts. Two circuit courts have directly held that the Second Amendment right to armed self-defense does not give out at the doorstep. *See Wrenn v. District of Columbia*, 864 F.3d 650, 661 (D.C. Cir. 2017); *Moore*, 702 F.3d at 935, 942. And *no* federal court of appeals has held that the Amendment *does not* apply outside the home.

      3.     The very purposes behind the Second Amendment's codification show that it must protect the carrying of arms outside the home. As announced by its "prefatory" clause, the Amendment was designed in part "to prevent elimination of the militia." *Heller*, 554 U.S. at 599. A right to bear arms limited to the home would be ill-suited to "rearing up and qualifying a well-regulated militia," *id.* at 612 (quoting *Nunn v. State*, 1 Ga. 243, 251 (1846)), for if citizens could be prohibited from carrying arms in public they simply could not act as the militia at all.

Of course, the militia was not "the only reason Americans valued the ancient right; most undoubtedly thought it even more important for self-defense and hunting." *Id.* at 599. Hunting obviously cannot be conducted by those bearing arms only within their homes. And the same reasoning applies with even more force to

the "the *central component*" of the Second Amendment right: self-defense. *Id.* There is nothing in the Court's language to suggest that this core purpose may only be pursued in the home. Nor is there any such suggestion in the Amendment's text. And "one doesn't have to be a historian to realize that a right to keep and bear arms for personal self-defense in the eighteenth century could not rationally have been limited to the home." *Moore*, 702 F.3d at 936. "The Supreme Court has decided that the [Second Amendment] confers a right to bear arms for self-defense, which is as important outside the home as inside." *Id.* at 942. Indeed, according to the latest nationwide data from the Bureau of Justice Statistics, 18.4% of violent crimes occur at or in the victim's home, while 26.5% occur on the street or in a parking lot or garage.[4] Thus, "[t]o confine the right to be armed to the home is to divorce the Second Amendment from the right of self-defense described in *Heller* and *McDonald*." *Moore*, 702 F.3d at 937.

4.      Finally, the historical understanding of the right to keep and bear arms conclusively confirms that it extends outside the home.

As *McDonald v. City of Chicago* explains, "[s]elf-defense is a basic right, recognized by many legal systems from ancient times to the present day." 561 U.S. 742, 767 (2010). And because the need for self-defense may *arise* in public, it has

---

[4] BUREAU OF JUSTICE STATISTICS, CRIMINAL VICTIMIZATION IN THE UNITED STATES, 2008 STATISTICAL TABLES tbl. 61 (2010), http://goo.gl/6NAuIB.

11

long been recognized that the right to self-defense may be *exercised* in public. Thus, "[i]f any person attempts a robbery or murder of another, *or* attempts to break open a house in the night time, . . . and shall be killed in such attempt, the slayer shall be acquitted and discharged." 4 WILLIAM BLACKSTONE, COMMENTARIES *180 (emphasis added). "Sergeant William Hawkins's widely read Treatise of the Pleas of the Crown," *Atwater v. City of Lago Vista*, 532 U.S. 318, 331 (2001), likewise explained that "the killing of a Wrong-doer . . . may be justified . . . where a Man kills one who assaults him in the Highway to rob or murder him." 1 WILLIAM HAWKINS, A TREATISE OF THE PLEAS OF THE CROWN 71 (1716).

Because the right to self-defense was understood to extend beyond the home, the right to *armed* self-defense naturally was as well. Accordingly, by the late seventeenth century the English courts recognized that it was the practice and privilege of "gentlemen to ride armed for their security." *Rex v. Knight*, 90 Eng. Rep. 330 (K.B. 1686). A century later, the Recorder of London—a judge and "the foremost legal advisor to the city," *Parker v. District of Columbia*, 478 F.3d 370, 382 n.8 (D.C. Cir. 2007)—opined that "[t]he right of his majesty's Protestant subjects, to have arms for their own defence, and to use them for lawful purposes, is most clear and undeniable." *Legality of the London Military Foot-Association* (1780), *reprinted in* WILLIAM BLIZZARD, DESULTORY REFLECTIONS ON POLICE 59, 59 (1785). These "lawful purposes, for which arms may be used," were not limited

12

to the home, for they included "immediate self-defence, . . . suppression of violent and felonious breaches of the peace, the assistance of the civil magistrate in the execution of the laws, and the defence of the kingdom against foreign invaders." *Id.* at 63.

That understanding was shared on this side of the Atlantic. Indeed, "about half the colonies had laws *requiring* arms-carrying in certain circumstances," such as when traveling or attending church. NICHOLAS J. JOHNSON & DAVID B. KOPEL ET AL., FIREARMS LAW & THE SECOND AMENDMENT 106–08 (2012) (emphasis added). Plainly, if the law imposed on individuals a civic duty to bear arms "for public-safety reasons," *Heller*, 554 U.S. at 601, the law necessarily conferred on those citizens a corresponding right to do so. And that understanding endured in the next century, both before and after the Revolution. Indeed, as Judge St. George Tucker observed in 1803, "[i]n many parts of the United States, a man no more thinks, of going out of his house on any occasion, without his rifle or musket in his hand, than an European fine gentleman without his sword by his side." 5 WILLIAM BLACKSTONE, COMMENTARIES App. n.B, at 19 (St. George Tucker ed., 1803). And Tucker made clear that Congress would exceed its authority were it to "pass a law prohibiting any person from bearing arms." 1 *id.* App. n.D, at 289.

The practices of the Founding generation confirm that the right to carry arms was well-established. George Washington, for example, carried a firearm on an

expedition into the Ohio Country. WILLIAM M. DARLINGTON, CHRISTOPHER GIST'S JOURNALS 85–86 (1893). Thomas Jefferson advised his nephew to "[l]et your gun . . . be the constant companion of your walks," 1 THE WORKS OF THOMAS JEFFERSON 398 (letter of Aug. 19, 1785) (H. A. Washington ed., 1884), and Jefferson himself traveled with pistols for self-protection and designed a holster to allow for their ready retrieval, *see Firearms*, Monticello, https://goo.gl/W6FSpM. Even in defending the British soldiers charged in the Boston Massacre, John Adams conceded that, in this country, "every private person is authorized to arm himself; and on the strength of this authority I do not deny the inhabitants had a right to arm themselves at that time for their defence." John Adams, *First Day's Speech in Defence of the British Soldiers Accused of Murdering Attucks, Gray and Others, in the Boston Riot of 1770*, *in* 6 MASTERPIECES OF ELOQUENCE 2569, 2578 (Hazeltine et al. eds., 1905). And as an attorney, Patrick Henry regularly carried a firearm while walking from his home to the courthouse. HARLOW GILES UNGER, LION OF LIBERTY 30 (2010).

This understanding was also reflected in contemporary judicial decisions. As the panel decision in *Peruta v. County of San Diego* concluded after an exhaustive survey of the early-American case law, although "some courts approved limitations on the manner of carry outside the home, none approved a total destruction of the right to carry in public." 742 F.3d 1144, 1160 (9th Cir. 2014), *vacated*, 781 F.3d 1106 (9th Cir. 2015) (en banc); *see also, e.g.*, *Nunn*, 1 Ga. at 243, 249–51; *State v.*

14

*Reid*, 1 Ala. 612, 616–17 (1840); *Bliss v. Commonwealth*, 12 Ky. (2 Litt.) 90, 91–93 (1822).

To be sure, the right to bear arms is not a right to "carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Heller*, 554 U.S. at 626. For example, in the pre-history of the Second Amendment, English courts had read the Statute of Northampton as "prohibiting the carrying of 'dangerous and unusual weapons,' " *id.* at 627—weapons not protected by the right to keep and bear arms, *id.* at 623–24, 627—or otherwise "go[ing] armed to terrify the King's subjects," *Sir John Knight's Case*, 87 Eng. Rep. 75, 76 (K.B. 1686). But this rule against "*riding* or *going armed*, with dangerous or unusual weapons" and thereby "terrifying the good people of the land," 4 WILLIAM BLACKSTONE, COMMENTARIES *148–49, was not understood as extending to the ordinary carrying of weapons "usually worne and borne," WILLIAM LAMBARD, EIRENARCHA 135 (1588), unless "accompanied with such circumstances as are apt to terrify the people," 1 HAWKINS, *supra*, at 136. After all, even by the late seventeenth century there was "a general connivance to gentlemen to ride armed for their security." *Rex v. Knight*, 90 Eng. Rep. 330 (K.B. 1686).

Early American courts and commentators shared this understanding of the scope of the right to bear arms in self-defense. For instance, James Wilson, a leading Framer and Supreme Court Justice, explained in his widely read Lectures on Law

that it was unlawful only to carry "dangerous and unusual weapons, in such a manner, as will naturally diffuse a terrour among the people." 3 JAMES WILSON, THE WORKS OF THE HONOURABLE JAMES WILSON 79 (1804). After all, as another commentator explained, "in this country the constitution guaranties to all persons the right to bear arms; then it can only be a crime to exercise this right in such a manner, as to terrify the people unnecessarily." CHARLES HUMPHREYS, A COMPENDIUM OF THE COMMON LAW IN FORCE IN KENTUCKY 482 (1822); *see also State v. Huntly*, 25 N.C. 418, 422–23 (1843); *Simpson v. State*, 13 Tenn. 356, 359–60 (1833).

This reading of the Second Amendment persisted throughout the nineteenth century. Reconstruction Era views are "instructive" evidence of the Second Amendment's scope because they reflect "the public understanding of [the Amendment] in the period after its enactment." *Heller*, 554 U.S. at 605, 614. And those who wrote and ratified the Fourteenth Amendment clearly understood the right to bear arms to protect the carrying of firearms outside the home for self-defense.

For decades before the Civil War, the southern States had schemed to prevent their enslaved and free black populations from bearing arms at every turn. An 1832 Delaware law, for example, forbade any "free negroes [or] free mulattoes to have own keep or possess any Gun [or] Pistol," unless they first received a permit from "the Justice of the Peace" certifying "that the circumstances of his case justify his

keeping and using a gun." Act of Feb. 10, 1832, sec. 1, Del. Laws 180 (1832); *see also* Robert J. Cottrol & Raymond T. Diamond, *The Second Amendment: Toward an Afro-Americanist Reconsideration*, 80 GEO. L.J. 309, 336–38 (1991) (citing similar laws in Texas, Mississippi, Louisiana, South Carolina, Maryland, Virginia, and Georgia). Indeed, Chief Justice Taney recoiled so strongly in the infamous *Dred Scott* case from recognizing African Americans as citizens precisely because he understood that doing so would entitle them "to keep and carry arms wherever they went." *Dred Scott v. Sandford*, 60 U.S. (19 How.) 393, 417 (1857).

After the Civil War, these noxious efforts to suppress the rights of former slaves to carry arms for their self-defense continued. Mississippi's notorious "Black Code," for example, forbade any "freedman, free negro or mulatto" to "keep or carry fire-arms of any kind." An Act To Punish Certain Offences Therein Named, and for Other Purposes, ch. 23, § 1, 1865 Miss. Laws 165. Like restrictions were enacted in Louisiana and Alabama. Cottrol & Diamond, *supra*, at 344–45. And in an ordinance strikingly similar in operation to New Jersey's "justifiable need" law, several Louisiana towns provided that no freedman "shall be allowed to carry fire-arms, or any kind of weapons, within the parish" without the approval of "the nearest and most convenient chief of patrol." 1 WALTER L. FLEMING, DOCUMENTARY HISTORY OF RECONSTRUCTION 279–80 (1906).

17

As the Supreme Court explained at length in *McDonald*, the Reconstruction Congress labored mightily to entomb this legacy of prejudice. *See* 561 U.S. at 770–77. Congress's efforts culminated in the adoption of the Fourteenth Amendment, which ensured the right of every American, regardless of race, to "bear arms for the defense of himself and family and his homestead." Cong. Globe, 39th Cong., 1st Sess. 1182 (1866) (statement of Sen. Pomeroy); *see also McDonald*, 561 U.S. at 775–76.

### b. *Drake* erred in concluding that New Jersey's "justifiable need" requirement is longstanding and "presumptively lawful."

While acknowledging "that the Second Amendment's individual right to bear arms *may* have some application beyond the home," the *Drake* court concluded that the conduct burdened by New Jersey's "justifiable need" restriction was outside the Amendment's scope, because that restriction "qualifies as a 'longstanding,' 'presumptively lawful' regulation." 724 F.3d at 431–32. Not so.

*Drake*'s principle piece of evidence for this conclusion was a series of late-nineteenth-century laws targeting "the carrying of concealed weapons," *id.* at 433; *see also* Br. in Supp of State Defs' Mot. to Dismiss at 13 (Apr. 3, 2018), Doc. 16-3 ("MTD Brief") (relying on these laws).[5] But those laws provide scant support for

---

[5] Defendant Kenneth J. Brown, Jr., is separately represented in this matter, but he has joined the State's motion to dismiss and supporting brief in full. Letter from Paul L. LaSalle to Hon. Brian R. Martinotti (Apr. 9, 2018), Doc. 18-1. Accordingly we cite and refer to the State's brief throughout.

New Jersey's "justifiable need" requirement, for while they limited the carrying of *concealed* firearms—a practice that was considered dishonorable and especially dangerous, by the social mores of the day—they did so against the background of *freely allowing* the *open* carrying of arms in common use, thus "le[aving] ample opportunities for bearing arms." *Wrenn*, 864 F.3d at 662.

The fact that these laws left intact the background right to carry firearms in *some* manner was absolutely *critical* to most of the judicial opinions assessing their constitutionality. The distinction was relied upon by courts that upheld this type of law against constitutional challenge. *See State v. Chandler*, 5 La. Ann. 489, 490 (1850) (concealed carry ban "interfered with no man's right to carry arms . . . 'in full open view,' " and thus did not interfere with "the right guaranteed by the Constitution of the United States"); *Aymette v. State*, 21 Tenn. 154, 160–61 (1840); *State v. Reid*, 1 Ala. 612, 616–17 (1840). And it was also endorsed by the opinions *striking down* limitations on carrying firearms that cut too close to the core. *See Nunn*, 1 Ga. at 251 (limitation on "the practice of carrying certain weapons *secretly*" was "valid, inasmuch as it does not deprive the citizen of his *natural* right of self-defence, or of his constitutional right to keep and bear arms," but "prohibition against bearing arms *openly*" was "in conflict with the Constitution, and *void*"); *see also*

*Bliss*, 12 Ky. at 91–94.[6] These laws thus provide no historical pedigree for restrictions, like New Jersey's, which prohibit *both* open and concealed carrying and thus "amount[ ] to a destruction of the right" altogether. *Reid*, 1 Ala. at 616.

*Drake* resisted this conclusion, reasoning that although these historical laws were upheld "because open carrying remained available as an avenue for public carrying," they nonetheless supported the presumptive constitutionality of New Jersey's restrictions on "carry[ing] openly *or* concealed" because they demonstrated a "longstanding tradition of regulating the public carrying of weapons for self-defense." 724 F.3d at 433. But that line of argument fails because it "is conducted at too high a level of generality": concluding from the limited restrictions on *concealed* carrying that were generally upheld by the courts—but not without generating "grave discussion" and "a great difference of opinion on the question of" their constitutionality, 2 JAMES KENT, COMMENTARIES ON AMERICAN LAW *340 n.2 (O. Holmes ed., 12th ed. 1873)—that there was a tradition of restricting "the public carrying of weapons" generally is " 'akin to saying that because the government traditionally could prohibit defamation, it can also prohibit speech criticizing

---

[6] A few courts from this era upheld concealed carry bans without relying on this distinction, but they did so "on the basis of an interpretation of the Second Amendment . . . that conflicts with [*Heller*.]" *Kachalsky v. County of Westchester*, 701 F.3d 81, 91 n.14 (2d Cir. 2012). Those outlier decisions are thus "sapped of authority by *Heller*," and cannot be cited as reliable guides to the Second Amendment's scope. *Wrenn*, 864 F.3d at 658.

government officials.' " *Drake*, 724 F.3d at 433, 451 (Hardiman, J., dissenting) (quoting *Heller v. District of Columbia (Heller II)*, 670 F.3d 1244, 1294 (D.C. Cir. 2011) (Kavanagh, J. dissenting)). On this style of reasoning, *any* gun control law is "presumptively lawful" (and *Heller* was wrongly decided) because there is a "tradition" of regulating the use and possession of firearms for public safety. *Reductio ad absurdum*.

As Defendants note, MTD Brief 13, the *Drake* majority also thought New Jersey's law was *itself* sufficiently "longstanding," since "[t]he 'justifiable need' standard . . . has existed in New Jersey in some form for nearly 90 years." 724 F.3d at 432 (majority). That argument fails twice over. To begin, New Jersey imposed a "need" requirement on *all* public carrying for only *half* that time. As the Third Circuit recognized, until 1966 the State required a showing of "need" only for carrying *concealed* handguns while not restricting open carry—and its law was thus merely one example of the (irrelevant) concealed-carry restrictions just discussed. *Id.*

Second, even setting this point aside and starting the clock in 1924, an outlier law adopted by New Jersey and a handful of other jurisdictions nearly a century and a half after the Founding—and even today adhered to by well under a quarter of the States—hardly constitutes the type of longstanding, traditional limitation that *Heller* characterized as "presumptively lawful." 554 U.S. at 627 n.26. Like other

constitutional rights, the Second Amendment establishes minimum national standards that must be enforced against "resisting local outliers," Michael J. Klarman, *Rethinking the Civil Rights & Civil Liberties Revolutions*, 82 VA. L. REV. 1, 16 (1996), and the scope of the national standards cannot be dictated *by the outliers*. That is particularly so where the local restriction has been on the books for little more than a third of our American experiment and is not fairly grounded in historical restrictions of earlier vintage. "While two-hundred years from now, restrictions from [1924] may seem longstanding, looking back only to [1924], today, omits more than half of America's history and belies the purpose of the inquiry." *Mance v. Holder*, 74 F. Supp. 3d 795, 805 (N.D. Tex. 2015), *rev'd on other grounds sub nom. Mance v. Sessions*, 880 F.3d 183 (5th Cir. 2018).

Defendants are also wrong to suggest that the *Drake* majority's (erroneous) reasoning on this point provides a way of distinguishing the D.C. Circuit's decision in *Wrenn* striking down the District of Columbia's similar law. The State's theory is that because *Drake* relied on the fact that "New Jersey's law was over 90 years old" and the D.C. law in *Wrenn* "was adopted only in *2014*," the two cases can be "read . . . as co-existing peaceably." MTD Brief 11. That theory is directly contrary to *both Wrenn and Drake*. The court in *Wrenn* squarely rejected any argument that " 'longstanding' practices" of regulating public carriage "so shrank the right" that "good-reason laws [were] beyond its reach," holding instead that "even for those

22

lacking special self-defense needs," "the individual right to carry common firearms beyond the home for self-defense . . . falls within the core of the Second Amendment's protections." 864 F.3d at 659, 661. And *Drake*, for its part, explicitly rejected Defendants' argument "that the analysis of a particular regulation in a particular jurisdiction should turn entirely on the historical experience of that jurisdiction alone," as unsupported by "the Second Amendment jurisprudence of either the Supreme Court or this Court." 724 F.3d at 434.

*Drake* and *Wrenn* cannot be made to "co-exist[ ] peaceably." MTD Brief 11. And as the persuasive analysis in *Wrenn* shows, *Drake* erred in concluding that New Jersey's ban was "outside the scope of the Second Amendment's guarantee." 724 F.3d at 434. *Drake* should be reversed.

### c. The right to carry arms outside the home in self-defense is at the core of the Second Amendment.

The right to "carry weapons in case of confrontation," *Heller*, 554 U.S. at 592, is not only within the scope of the Second Amendment, it lies at the very core of that guarantee. *Heller* makes clear that the right to individual self-defense is "the *central component*" of the Second Amendment. *Id.* at 599. And because the Second Amendment's text, history, and purposes all show that its protections extend outside the home, the right to carry firearms "for the core lawful purpose of self-defense" necessarily extends beyond those four walls as well. *Id.* at 630. "Thus, the

23

Amendment's core generally covers carrying in public for self-defense." *Wrenn*, 864 F.3d at 659.

Again, *Drake* disagreed with this conclusion. While "[a]ssuming that the Second Amendment individual right to bear arms does apply beyond the home" for the sake of analysis, the Third Circuit held that "that right is not part of the core of the Amendment." 724 F.3d at 431, 436. But because *Drake* refused to engage in any meaningful "historical analysis" of whether the Second Amendment applies outside the home, it simply had *no basis* for concluding that the right to bear arms outside the home "is not part of the core of the Amendment." *Id.* at 431, 436. While the Third Circuit's decision to assume *arguendo* that the Second Amendment applies in public may have been "meant to be generous to the plaintiffs, by granting a premise in their favor," its effect was to leave the Third Circuit's conclusion that the right to bear arms has diminished importance outside the home unmoored from any justification whatsoever. *Wrenn*, 864 F.3d at 663.

For the same reason, Defendants' reliance on decisions from the Second and Fourth Circuits upholding laws similar to New Jersey's are to no avail.[7] Each of

---

[7] Defendants also cite the Tenth Circuit's decision in *Peterson v. Martinez*, 707 F.3d 1197 (10th Cir. 2013), but that case is of no help to them. Akin to the nineteenth-century cases discussed above, *Peterson* held only that "the Second Amendment does not confer a right to carry *concealed* weapons." 707 F.3d at 1211 (emphasis added). The court *expressly declined* to address whether the restriction on concealed carrying at issue in that case unconstitutionally "deprive[d] [the plaintiff]

those cases committed precisely the same error as *Drake*: "simply assum[ing] for argument's sake that the [Second] Amendment covers *some* carrying," and then proceeding to "dispens[e] with the historical digging . . . essential to locating the Amendment's edge, or at least its core." *Wrenn*, 864 F.3d at 661–63. The repetition of this error by each of these courts does not somehow transform it into sound legal reasoning.

Had *Drake* fairly engaged in the textual and historical analysis required by *Heller*, it would have reached the same conclusion as the two circuits that *have* treated seriously with the Second Amendment's text and history. *See Wrenn*, 864 F.3d at 661; *Moore*, 702 F.3d at 937, 942. For as shown above, these sources of authority leave no doubt that this constitutional guarantee extends outside the home. *See supra*, Part I.A. And because that is so, the right to *bear* arms "for the core lawful purpose of self-defense," *Heller*, 554 U.S. at 630, can be no further from the heartland of the Second Amendment than the right to *keep* them.

---

of any meaningful opportunity to bear arms" when viewed alongside the government's simultaneous "restriction on the open carrying of firearms," in light of the plaintiff's deliberate decision not to challenge that latter restriction. *Id.* at 1211–12 (quotation marks omitted). Here, by contrast, the challenged law restricts "the carrying of a handgun in public, either openly or concealed," and Plaintiffs seek "to carry firearms outside the home for the purpose of self-defense" in whatever manner the State prefers. Compl. ¶¶ 5, 17. *Peterson*'s narrow holding is irrelevant to this type of challenge.

**II.     Under *Heller*, Defendants' requirement that law-abiding citizens demonstrate a special need for self-defense to exercise their Second Amendment rights is categorically unconstitutional.**

Given that the core of the Second Amendment extends to armed self-defense outside the home, *Heller* makes the next analytical steps clear. Because "[t]he very enumeration of the right takes out of the hands of government—even the Third Branch of Government—the power to decide on a case-by-case basis whether the right is *really worth* insisting upon," wholesale infringements upon the Amendment's "core protection" must be held unconstitutional categorically, not "subjected to a freestanding 'interest-balancing' approach." *Heller*, 554 U.S. at 634–35. Defendants' prohibition on the right of typical, law-abiding citizens to bear arms for the purpose of self-defense is just such an infringement of core Second Amendment conduct. Accordingly, it is flatly unconstitutional.

*Heller* requires *per se* invalidation of broad bans that strike at the heart of the Second Amendment. In *Heller*, the Supreme Court declined the invitation to analyze the ban on possessing handguns at issue under "an interest-balancing inquiry" based on the "approach . . . the Court has applied . . . in various constitutional contexts, including election-law cases, speech cases, and due process cases," 554 U.S. at 689–90 (Breyer, J., dissenting), ruling instead that the right to keep and bear arms was "elevate[d] above all other interests" the moment that the People chose to enshrine it in the Constitution's text, *id.* at 635 (majority opinion). And in *McDonald*, the

26

Court reaffirmed that *Heller* had "expressly rejected the argument that the scope of the Second Amendment right should be determined by judicial interest balancing." 561 U.S. at 785 (plurality opinion).

Defendants' demand that applicants show "a special danger to [their] life," N.J.A.C. 13:54-2.4(d)(1), that is distinguishable from "[g]eneralized fears for personal safety," *In re Preis*, 573 A.2d at 152, *extinguishes* the core Second Amendment rights of *typical* citizens—who by definition cannot make such a showing. To be sure, Defendants' limits allow individuals to carry firearms if they can first "specify in detail [their] urgent necessity for self-protection." N.J.A.C. 13:54-2.4(d)(1). But the Second Amendment does not set up a race between law-abiding citizens and their assailants to the license bureau. For those whose lives or safety are being threatened, it is cold comfort to know that they could have carried a firearm *if only they could have documented their "urgent necessity for self-protection" in advance*. Surely under the Second Amendment—which protects the right to bear arms "*in case* of confrontation," *Heller*, 554 U.S. at 592 (emphasis added)—that scheme gets things exactly backwards.

Indeed, the State's demand that its citizens prove to the Government's satisfaction that they have a good enough reason to carry a handgun is flatly inconsistent with the very nature of the Second Amendment right. The existence of that right is itself reason enough for its exercise. It is thus no surprise that courts

have rejected this kind of "ask-permission-first" regime across a wide variety of constitutional rights, reasoning that the government has failed to honor a right if it demands to know—and assess *de novo*—the reasons justifying each occasion of its exercise. *See, e.g.*, *First Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765 (1978) (government cannot condition speech on "a requirement that the speaker have a sufficiently great interest in the subject to justify communication"); *New York Times Co. v. United States*, 403 U.S. 713, 714 (1971) (prior restraint presumptively unconstitutional); *Employment Div., Dep't of Human Res. of Oregon v. Smith*, 494 U.S. 872, 887 (1990) (government cannot "question the centrality" or "plausibility" of religious convictions); *see also Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751, 2778 (2014).

In short, as the D.C. Circuit persuasively concluded, a justifiable-need-type requirement that limits the carrying of firearms outside the home to those with a "heightened need" for self-defense "is necessarily a total ban on most . . . residents' right to carry a gun in the face of ordinary self-defense needs." *Wrenn*, 864 F.3d at 666. Indeed, such a restriction "destroys the ordinarily situated citizen's right to bear arms not as a side effect of applying other, reasonable regulations . . . , but by design: it looks precisely for needs 'distinguishable' from those of the community." *Id.* Such a prohibition is unconstitutional *per se*.

**III.** *Drake* **was wrong to uphold Defendants' "justifiable need" restriction under intermediate scrutiny.**

  **a. Strict scrutiny should apply.**

Even if Defendants' restrictions were not *categorically* unconstitutional, they should at the least be subjected to the highest level of constitutional scrutiny. As the Supreme Court has explained, "strict judicial scrutiny [is] required" whenever a law "impinges upon a fundamental right explicitly or implicitly protected by the Constitution." *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 17 (1973). And the right to bear arms is not only enumerated in the constitutional text; it was also counted "among those fundamental rights necessary to our system of ordered liberty" by "those who drafted and ratified the Bill of Rights." *McDonald*, 561 U.S. at 768, 778. *Drake*'s application of merely intermediate scrutiny, by contrast, relegates the Second Amendment to "a second-class right." *Id.* at 780 (plurality).

  **b. Defendants' "justifiable need" restriction fails even intermediate scrutiny, properly applied.**

Ultimately, determining the correct standard of scrutiny is immaterial, however, because the "justifiable need" restriction should be struck down under any level of heightened scrutiny.

  1.   That is so, first, as a matter of law. By design, Defendants' restrictions will reduce firearm violence *only by reducing the quantity of firearms in public*. That is "not a permissible strategy"—even if used as a means to the further end of

29

increasing public safety. *Grace v. District of Columbia*, 187 F. Supp. 3d 124, 148 (D.D.C. 2016), *aff'd sub nom. Wrenn v. District of Columbia*, 864 F.3d 650. That conclusion follows directly from the Supreme Court's precedents in the secondary-effects area of free speech doctrine.

The Supreme Court has held that government restrictions on certain types of expressive conduct—most commonly, zoning ordinances that apply specifically to establishments offering adult entertainment—are subject to merely intermediate scrutiny even though they are content-based. *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 47–51 (1986). But this lesser scrutiny applies only so long as the *purpose and effect* of the restrictions is to reduce the negative "secondary effects" of the expression—such as the increased crime that occurs in neighborhoods with a high concentration of adult theaters—rather than to suppress the expression itself. *Id.* at 49. As Justice Kennedy's controlling opinion in *City of Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425 (2002), makes clear, in defending a restriction as sufficiently tailored to further an important or substantial governmental interest, the government may not rely on the proposition "that it will reduce secondary effects by reducing speech in the same proportion." *Id.* at 449 (Kennedy, J., concurring). "It is no trick to reduce secondary effects by reducing speech or its audience; but [the government] may not attack secondary effects indirectly by attacking speech." *Id.* at 450; *see also Heller v. District of Columbia (Heller III)*, 801 F.3d 264, 280 (D.C.

30

Cir. 2015); *Drake*, 724 F.3d at 455–56 (Hardiman, J., dissenting); *Grace*, 187 F. Supp. 3d at 148.

But that is precisely what Defendants have done here. Their restrictive licensing policies do not regulate the *manner* of bearing arms or impose reasonable training and safety requirements. No, their purpose and effect is to *limit the number of arms borne in public*, and to the extent this leads to a reduction of gun crime, that is only a byproduct of this suppression of the quantity of core Second Amendment conduct. As the state courts have explained, "the overriding philosophy of our Legislature is to limit the use of guns as much as possible." *State v. Valentine*, 124 N.J. Super. 425, 427 (App. Div. 1973). Or as the President of the New Jersey Senate recently stated, "This is New Jersey. It's not some State that thinks everyone should be carrying a gun . . . . [C]oncealed weapons don't belong in New Jersey." Steve Sweeney, President, New Jersey Senate, Remarks, N.J. Governor and Attorney General Announce Intention to Tighten Restrictions on Handgun-Carry Permits at 12:55 (Jan. 26, 2018), *available at* https://goo.gl/U4iTET.

Indeed, Defendants' purpose is clear from their own description of the justification of the challenged law: "It is New Jersey's judgment that when an individual carries a handgun in public for his or her own defense he or she necessarily exposes members of the community to a somewhat heightened risk that they will be injured by that handgun." MTD Brief 16–17. But *the People* weighed

31

both the risks and benefits and of the right to keep and bear arms when they wrote it into the Constitution; New Jersey is not free to "conduct" that "interest balancing . . . for them anew." *Heller*, 554 U.S. at 635.

As the D.C. Circuit concluded, limits like Defendants' "justifiable need" restriction "destroy[ ] the ordinarily situated citizen's right to bear arms not as a side effect of applying other, reasonable regulations . . . . but by design." *Wrenn*, 864 F.3d at 666. That is "not a permissible strategy," *Grace*, 187 F. Supp. 3d at 148, under any level of heightened scrutiny.

2.      Even if these objections are set aside, the heightened need requirement still flunks intermediate scrutiny, and *Drake* was still wrong to uphold it. To survive intermediate scrutiny, a restriction must be "substantially related to the achievement" of the government's objective. *United States v. Virginia*, 518 U.S. 515, 533 (1996). "The burden of justification is demanding and it rests entirely on the State." *Id.* As Judge Posner concluded after surveying "the empirical literature on the effects of allowing the carriage of guns in public," that data does not provide "more than merely a rational basis for believing that [an outright ban on public carriage] is justified by an increase in public safety." *Moore*, 702 F.3d at 939, 942.

This is confirmed by experience. Forty-two States do not restrict the carrying of firearms to a privileged few. *See Gun Laws*, NRA-ILA, https://goo.gl/Nggx50. Yet "many years of evidence across different states and time periods

32

overwhelmingly rejects" the claim that "permit holders will use their guns to commit crimes instead of using their guns for self-defense." David B. Mustard, *Comment*, *in* EVALUATING GUN POLICY 325, 330 (Jens Ludwig & Philip J. Cook eds., 2003); *see also id.* at 330–31. As social scientists in favor of gun control have acknowledged, there would be "relatively little public safety impact if courts invalidate laws that prohibit gun carrying outside the home, assuming that some sort of permit system for public carry is allowed to stand," since "[t]he available data about permit holders . . . imply that they are at fairly low risk of misusing guns." Philip J. Cook et al., *Gun Control After* Heller, 56 UCLA L. REV. 1041, 1082 (2009).

Further, even if laws that more freely grant permits have not been shown to decrease crime, there is no persuasive evidence that they *increase* crime—and that is the proposition Defendants must support. For instance, in 2004 the National Academy of Sciences' National Research Council ("NRC") conducted an exhaustive review of the relevant social-scientific literature. The NRC concluded that "with the current evidence it is not possible to determine that there is a causal link between the passage of right-to-carry laws and crime rates." NATIONAL RESEARCH COUNCIL, FIREARMS AND VIOLENCE: A CRITICAL REVIEW 150 (Charles F. Wellford, John V. Pepper, & Carol V. Petrie eds., 2005), http://goo.gl/WO1ZNZ. *See also* Robert Hahn et al., *Firearms Laws and the Reduction of Violence: A Systematic Review*, 28 AM. J. PREVENTATIVE MED. 40, 53–54 (2005), http://goo.gl/zOpJFL (CDC study

33

concluding that existing evidence does not establish that more permissive carry regimes "increases rates of unintended and intended injury").

*Drake*'s cursory discussion of whether New Jersey's "justifiable need" requirement actually advances its public-safety justification fell far short of the court's duty "to assure that, in formulating its judgments, [New Jersey] has drawn reasonable inferences based on substantial evidence." *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 666 (1994). The sum total of the "evidence" discussed by the court in purportedly conducting intermediate scrutiny was confined to: (1) a "staff report" evaluating "the utility of firearms as weapons of defense against crime" that was published *in 1968*, and (2) the fact that "[l]egislators in other states, including New York and Maryland, have reached this same predictive judgment and have enacted similar laws as a means to improve public safety." *Drake*, 724 F.3d at 438. But a law that "imposes current burdens . . . must be justified by current needs," *Shelby Cty. v. Holder*, 570 U.S. 529, 536 (2013), and a single study from fifty years ago hardly constitutes "substantial evidence" that New Jersey's restriction can be said, in light of the *current* empirical evidence, to materially advance public safety. Nor does the bare fact that a handful of other jurisdictions have enacted similar restrictions suffice, without at least some analysis of whether *those* laws are effective in preventing violent crime or are themselves supported by substantial evidence.

After all, the vast majority of States *do not* restrict their citizens' right to carry in this way.

The lack of evidence that these laws advance public safety should not be surprising, because violent criminals will continue to carry guns in public regardless. As the Supreme Court recently held in the context of abortion restrictions, "[d]etermined wrongdoers, already ignoring existing statutes and safety measures, are unlikely to be convinced to [change their conduct] by a new overlay of regulations." *Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292, 2313–14 (2016). This is not a novel proposition. In a passage Thomas Jefferson copied into his personal quotation book, the influential Italian criminologist Cesare Beccaria reasoned that laws forbidding the

> wear[ing of] arms . . . disarm[] those only who are not disposed to commit the crime which the laws mean to prevent. Can it be supposed, that those who have the courage to violate the most sacred laws of humanity, and the most important of the code, will respect the less considerable and arbitrary injunctions, the violation of which is so easy, and of so little comparative importance? . . . [Such a law] certainly makes the situation of the assaulted worse, and of the assailants better, and rather encourages than prevents murder.

*See* Stephen P. Halbrook, *What the Framers Intended: A Linguistic Analysis of the Right To "Bear Arms*,*"* 49 LAW & CONTEMP. PROBS. 151, 154 (1986).

Instead of criminals, it is primarily the *law-abiding* who are affected by Defendants' restrictions. And that effect has very real public-safety *costs*—costs that Defendants entirely ignore. Although the number of defensive gun uses is difficult

35

to measure, the leading study on the issue, the National Self-Defense Survey, "indicate[s] that each year in the U.S. there are about 2.2 to 2.5 million [defensive uses of guns] of all types by civilians against humans." Gary Kleck & Marc Gertz, *Armed Resistance to Crime: The Prevalence and Nature of Self-Defense With a Gun*, 86 J. CRIM. L. & CRIMINOLOGY 150, 164 (1995). "At least 19 other surveys have resulted in [similar] estimated numbers of defensive gun uses." NATIONAL RESEARCH COUNCIL, *supra*, at 103. Many of these defensive gun uses involve carrying firearms in public. The National Self-Defense Survey indicates that "anywhere from 670,000 to 1,570,000 [defensive gun uses] a year occur in connection with gun carrying in a public place." Gary Kleck & Marc Gertz, *Carrying Guns for Protection: Results from the National Self-Defense Survey*, 35 J. RESEARCH IN CRIME & DELINQUENCY 193, 195 (1998). Any realistic appraisal of existing social-scientific data thus leads inexorably to the conclusion that the "justifiable need" requirement cannot be shown to benefit the public safety—but it may well harm it.

3.     Even if Defendants' "justifiable need" restriction did advance public safety, it independently fails heightened scrutiny because it is not properly tailored to that purpose. While laws subject to intermediate scrutiny "need not be the least restrictive or least intrusive means of serving the government's interests," they still must be narrowly tailored, possessing "a close fit between ends and means."

36

*McCullen v. Coakley*, 134 S. Ct. 2518, 2534–35 (2014) (quotation marks omitted). Here, there is an utter lack of fit between Defendants' restrictions and their purported objective of public safety. After all, "the fact that a person can demonstrate a heightened need for self-defense says nothing about whether he or she is more or less likely to misuse a gun." *Grace*, 187 F. Supp. 3d at 149. "This limitation will neither make it less likely that those who meet the [justifiable need] requirement will accidentally shoot themselves or others, nor make it less likely that they will turn to a life of crime. Put simply, the solution is unrelated to the problem it intends to solve." *Drake*, 724 F.3d at 454 (Hardiman, J., dissenting).

## IV.    Defendants Oxley and Conforti are not entitled to judicial immunity.

Finally, the State is wrong to contend that Defendants Oxley and Conforti—the New Jersey judges who denied the Handgun Carry Permit applications of Plaintiff Rogers and the member of the Association of New Jersey Rifle & Pistol Clubs described in the complaint—are protected from this lawsuit by "absolute judicial immunity." MTD Brief 18. While state judicial officers are immune from injunctive relief based on acts taken in their "judicial capacity," 42 U.S.C. § 1983,[8]

---

[8] Defendants rely on the judicial immunity "established at common law," MTD Brief 18, but as the Supreme Court's decision in *Pulliam v. Allen* makes clear, the common-law immunity discussed in the cases Defendants cite does not bar "prospective injunctive relief against a judicial officer acting in her judicial capacity," 466 U.S. 522, 541–42 (1984); *see also* MTD Brief 18 (citing cases that all involve "liability for damages"). Following the Supreme Court's decision in

Defendants concede that judicial immunity does not extend to "nonjudicial actions, *i.e.*, actions not taken in the judge's judicial capacity." MTD Brief 19 (quoting *Mireles v. Waco*, 502 U.S. 9, 12 (1991)). And New Jersey law makes clear beyond any doubt that the state judge's role in administering the handgun permitting regime is quintessentially nonjudicial.

As the New Jersey Supreme Court held in *Siccardi v. State*, "[t]he legislative designation of the judiciary as the issuing authority . . . burdened the Justices with functions which were *clearly nonjudicial* in nature; indeed the Justices might well have declined the designation as unduly interfering with the proper discharge of their judicial responsibilities." 59 N.J. 545, 553 (1971) (emphasis added). In *In re Pries*, the Supreme Court reiterated that in providing for "a Superior Court judge to issue [each Handgun Carry] permit . . . the Legislature has reposed what is *essentially an executive function* in the judicial branch. We have acceded to that legislative delegation . . . although we 'might well have declined the designation' because the 'functions . . . were clearly non-judicial in nature.' " 573 A.2d at 151 (last alteration in original) (emphasis added) (quoting *Siccardi*, 59 N.J. at 553). The relief Plaintiffs seek against Defendants Oxley and Conforti in this action would thus affect the very

---

*Pulliam*, Congress amended Section 1983 to partially restore judicial officers' immunity from injunctive relief. *See* 42 U.S.C. § 1983; *Brandon E. ex rel. Listenbee v. Reynolds*, 201 F.3d 194, 197–98 (3rd Cir. 2000). Any immunity Defendants Oxley and Conforti may enjoy thus arises from this amendment to Section 1983, not the common law.

paradigm of those "administrative . . . or executive functions that judges may on occasion be assigned by law to perform" that are *not* "entitled to immunity." *Forrester v. White*, 484 U.S. 219, 227 (1988).

Finally, even if Defendants Oxley and Conforti were immune from suit, Defendants do not dispute that no immunity protects the remaining defendants: Attorney General Grewal, Superintendent Callahan, and Chief Brown. Their presence as parties defendant is sufficient to allow the case to go forward, and Defendants do not suggest otherwise.

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss Judge Oxley and Judge Conforti from the suit should be denied, and *Drake* should be overruled by a court competent to do so.

Dated:  April 23, 2018

David H. Thompson*
Peter A. Patterson*
John D. Ohlendorf*
COOPER & KIRK, PLLC
1523 New Hampshire Avenue, N.W.
Washington, D.C. 20036
(202) 220-9600
(202) 220-9601 (fax)
dthompson@cooperkirk.com

*Appearing *pro hac vice*

Respectfully submitted,

s/ Daniel L. Schmutter
Daniel L. Schmutter
HARTMAN & WINNICKI, P.C.
74 Passaic Street
Ridgewood, New Jersey 07450
(201) 967-8040
(201) 967-0590 (fax)
dschmutter@hartmanwinnicki.com

*Attorneys for Plaintiffs*

39

## CERTIFICATE OF SERVICE

I hereby certify that on April 23, 2018, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will cause a copy of the document to be served electronically on all parties or their counsel.

s/ Daniel L. Schmutter
Daniel L. Schmutter

*Attorney for Plaintiffs*
